Yes, Your Honor. Good morning, Your Honors. And may it please the Court, I'm Barbara O'Connor for Mr. Johnson. And I'd like to reserve three minutes for rebuttal. Thank you. I thought I would first take a minute of my time, my precious time, to introduce Mr. Johnson to you today, because I haven't been in this courtroom since, I think, 1997, I argued an en banc case here. Although I've been in other courtrooms since then. And that case I also argued in the Supreme Court. But to my mind, this case is much more important, and maybe the most important case I've ever had. And I say that because I feel so strongly that there was a huge injustice done here in the failure of the courts to really review Mr. Johnson's statement. And I am hopeful that this Court will fix that. Oh, very nervous. I'm sorry about that. The California Supreme Court clearly found that Detective Carver's conduct was coercive. Where did they find that? They found that... They said it was a predicate. They said it was the predicate. They didn't say it was clearly coercive. They said it was the predicate for coercion. It's a predicate for a claim. Yes, the predicate for a claim of coercion. And one thing I want to make sure that everyone is on the same page about is that there are two statements that were at issue in Mr. Johnson's case. The first was what occurred in the holding cell. That was what Mr. Johnson testified about in the, in my mind, off-the-cuff pretrial hearing that was held. We're not dealing with a Miranda question, are we? We're not. We're dealing with whether he was coerced in his interrogation, is that correct? Exactly right, in the interview. So, in the interview, here's a funny way of putting it, but you know, an awful lot of gang-type kids are very sophisticated. When we think about them, we like to think about, you know, the 1940s teenager bopping around in bobby socks and things like that. A lot of these kids are very sophisticated. Anybody who's dealt with gang kids knows that. We did look at the video, and he doesn't look much more nervous or put upon than, I hate to say it, an awful lot of lawyers do in the much less coercive atmosphere of the Ninth Circuit. As is, you may have one in front of you, but... You know, so that, you know, the one that's to focus on is kidness, and that's important, of course, but one has to take into account what kind of person we're dealing with. All does not want... No one does, and that's why I'm trying to give you a view of Mr. Johnson, who I just mentioned to Mr. Katz I'm going to see tomorrow because this is one of the most respectful young men that I've dealt with, and I was a federal defender for 15 years in Los Angeles for most of that, so I've dealt with a lot. Counsel, your client was under arrest at the time of the interrogation, and he had already been arrested for murder. Yes, Your Honor. So how does that context inform us in analyzing the nature of the promise or threat that occurred here? In other words, when the detective said, essentially, you're going to go down for this murder unless you tell us what happened, it's sort of... He's already been arrested for the murder, so it's not a threat to arrest him for it. It's more or less things will go better for you, perhaps, if you tell us what happened. Why is that different from what usually goes on when people are encouraged to tell their side of the story, that perhaps things will go a little more easily for you if you talk to us? I think it's a far cry from, I'll tell the prosecutor you were helpful, I'll tell the judge you were truthful. Those are permissible statements. To say to this young man who, while he may have not appeared as a small child, he was a learning disabled just 15-year-old. Well, he says he's learning disabled, but he certainly handled himself beautifully in front of all those policemen in the interrogation room. And by the way, according to him, he had already earlier on confessed to having committed a robbery, i.e. in the holding tank, and so in the interrogation room he didn't give them anything else. The most he said was, Tom, you committed robbery. He never, in spite of all this coercion and hard times he's getting, etc., etc., etc., he never does admit to the crime he really, apparently, according to the evidence, committed. Well, he never admits to being the shooter, and in fact the video of the incident is not a video at all. There are still shots that are very confusing, which is why a composite was introduced that day without objection. Let me ask you, what's wrong with the police saying to somebody, we're going to put you away for murder unless you can give us some good reason not to? What's wrong with that? I don't think that's what they said, Your Honor. I think they said, you talk to us or you'll be booked for murder, which is a lie. You need to tell us the truth and tell us what happened in the store that night or we're going to book you for murder, and nobody's there going to save you. What's wrong with that? Well, A, it's not true. He was already booked for murder. He wasn't really booked, was he? He wasn't in the jail? Yes, Your Honor, he was. He was taken out of his house at 4.30 or 5 o'clock in the morning. He was under arrest. He was under arrest. Had he actually been booked? That's what Detective Carver says. Yes, but was that true? Had he actually been taken to the jail and booked into jail? He was in the holding cell for several... The answer is no, I guess. He wasn't in jail. I think he was in jail, Your Honor. He was in a holding cell. You just said he was in a holding cell. Was he at the police station? Yes. So he's not in the jail. He's at the police station. Okay, so... He was in a cell. Yes, Your Honor. All right, but let's get the facts straight. He wasn't in the jail. He was in... He was in a cell in the police department. Correct, Your Honor. Now, what's wrong with saying we're going to what I just read? What's wrong with that? Your Honor, I think the clear implication to him is if you don't talk to us, we will book you for murder. And I think that's improper coercion. He clearly says that he understands that to be the message that he's receiving. And my ardent request is that you consider not only the video, but the objective facts about Mr. Johnson, his age, his education, the circumstances. The State says there were two requests for the bathroom. No, there were three. And, Your Honor, the transcript is not a transcript of the videotape. It's of the audiotape because the interview goes on after that transcript ends. And there are also sections that you'll see in the videotape, if you have the transcript next to you, are not transcribed at all. The videotape looks no more coercive than the other. In fact, the difficulty, I think, with Mr. Johnson with the videotape is the videotape makes it seem almost less coercive than just reading the transcript of because you can see how he's reacting and what he's doing. And he sure doesn't look like a cringing, put-upon kid in that thing. He's lying most of the time, probably. He's very good at handling himself, it looks like. Well, he's also scared, crying, slamming his fists down, rocking back and forth, talking to himself when he's alone in the room. Yeah. And he's under the impression that if he doesn't talk, he's going to be booked for murder. I think that is a coercive statement to a young man of his ilk and his education and his status. You know, if you want to save time, you're down to a minute. I do, Your Honor. I'm sorry. Thank you. May it please the Court. Deputy Attorney General Michael Katz for Respondent. Here we have a defendant who comes to you with a claim that his confession for murder was colorist after he was read his Miranda rights. This is not the rare case that the Supreme Court spoke of where a defendant can have a colorable claim after being read his Miranda rights. There's no dispute between the parties, but he was indeed read his Miranda rights. In addition, he comes to you after he made a claim in the trial court, which undermines the current claim. Now, I didn't quite get this right in my briefing as I re-read it yesterday. I said that his claim in the trial court was that his confession was coerced based on promises of leniency before he got into the interview room. What he said was something slightly different, but I don't think it makes a difference to the analysis here. And that is that he said in the trial court that his Miranda waiver was not voluntary because of promises of leniency before he got into the interview room. Fundamentally, what he was saying was his confession was coerced based on police misconduct. That's what he said in the trial court. That's what he said here. But he gave completely different reasons for why it was coerced, and that's why the trial court found it incredible, and that's why you should find it incredible. Based on the totality of the circumstances, it was merely a 95-minute interrogation with pauses. It took him 30 minutes to admit his guilt of the robbery, which implicated himself in the murder. So this wasn't putting the screws to him. What do you make of the court of appeals statement that Detective Carver's statement was sufficient to create a predicate for a claim of coercion? What do you make of that? Well, Judge Silberman, I think the implication in your question to my colleague, and I realize you weren't taking a position, but I think the implication of your question is right, that the court of appeal merely said that it was a predicate for an ineffective assistance of counsel claim. So that just means that it's not frivolous for ineffective assistance of counsel claim for prong one of ineffective assistance of counsel, which is not the claim before you. The court of appeal at the state level did not say that it was coercive, and it certainly didn't say that it was the motivating cause, which the Supreme Court tells us is a necessary element of a voluntariness claim. What does he say was the motivating cause of his confession? Well, it's kind of a bait-and-switch, Your Honor. Before you now, he says that the motivating cause was he was promised leniency when he got into the interview room. Then he adds a bunch of things he never said before about how he was threatened in the interview room, and he attacks on various things, that they've made promises about his mother. In the trial court, it was something completely different. He said, I was promised leniency before I ever got in the interview room, and that's part of what the trial court had a problem with in finding him a predicate. What led the trial court to find him incredible was that he switches claims around. It's just not believable that a person who was actually coerced in an interview room would come before the trial court when he was represented by counsel and say that he was coerced for some completely different reason. Well, you know, I'm not sure why that matters. The claim before us is the claim before us, and what happened in the interview room, we have a video of some of it. We have a transcript of it, and it is whatever it is, regardless of what arguments were or were not made. So what do you think we should do in analyzing the statements that Carver made? Basically, if you want to stick with your story, you can do that, but you're going to go down as the murder suspect if you stick with your story. So potentially that can be viewed as an implied threat or promise that you need to confess in order to help yourself. How should we analyze that? Well, Judge Graber, under other circumstances it might have been, but the way you should analyze it is the Supreme Court tells us that it has to be the motivating cause, even if it is a threat or a promise of leniency. And that is why it's completely relevant as to what he said before. This Court has held under other circumstances that when a defendant comes before this Court with a claim that is the opposite of what the defendant said below, under oath, then it makes the claim in this Court less credible. There was a case that I cited involving a defendant who claimed that his plea was coerced. At the time of the plea, he said it's not coerced. So this Court held that undermined his claim. And so the reason it matters, Your Honor, as to what he said below, is precisely because it has to be the motivating cause of his confession, even assuming that he was threatened or promised leniency. And it can't be the motivating cause in a credible sense if he gave a completely conflicting explanation below. Now, he said one of the reasons he confessed is he thought he would be able to go home in three days. Is that right? He said below that that was the reason. And if you'll note— Why isn't that the same as saying I thought they were going to give me a break or I thought they were giving me leniency, I thought they'd let me out in three days? It is the same, except that he's talking about a different time frame. He claimed that the three-day statement is nowhere to be found in the DVD or in the transcript that you have before you. What he was talking about was he claimed that they made the remark, what, three days, before he ever got in the interview room. And that's his problem now. In the holding cell. That's right. And the trial court said, I just don't believe that. That's just nonsense. That's right, Your Honor. And the reason the trial court said that was because nobody who claimed to be coerced into the holding cell would then hold out for 30 minutes with great ability, seemingly under the normal amount of stress a murderer would have before the police. But he didn't seem to be beside himself for those 30 minutes. And if he, in fact, had been coerced into the holding cell, he never would have behaved that way for the first 30 minutes on DVD. So that was the problem. I think under the Tellday circumstances, there are a couple of other things I want to get to if I have time. First of all, Petitioner correctly observed since reply brief that when the trial court added that he did not appear to be immature, it was actually referring to a videotape of the murder, not the videotape of the interview. And I got that wrong in my briefing. I don't think that makes a difference, but I just wanted to own up to that. Also, the Petitioner says in one of his briefs that the deputies were dishonest with him when they said that if he was not the shooter, it would make a difference. Actually, that's not really fair. The deputies said they needed to know because it might matter, and they had no idea that he was going to come back and say I was the person who went around the counter and demanded money. I mean, they had no idea he was going to say that. And you can conceive of a situation where it might matter to a prosecutor. If the juvenile says I wasn't even aware that a robbery was going to occur, I was standing in the store when the guy who went in the store with me started to commit a robbery and did the shooting, that would matter. And so the police, excuse me, the deputies had a good reason for that. They weren't lying when they said that. So that's just not fair. And unless the Court has any other questions, I'm prepared to submit the matter. Thank you, Mr. Katz. Thank you, Your Honor. Ms. O'Connor, you get the last word, and I think you have about a minute and a half left. Thank you, Your Honor. I just want to again clarify because Mr. Katz just did the same thing. Stephen Johnson never testified about the reasons that he confessed in the interview. He was never asked about it, and he has never testified about it. So his credibility is a non-issue when you're talking about what happened in the interview room. If you read the transcript of the pretrial motion, the prosecutor is talking to him and asking questions about the holding cell. There are two interviews, two statements, and we're talking about the interview statement, which is the only one at issue before this Court. I wanted to just point out finally, in my few remaining seconds, differences between Mr. Johnson and Mr. Doody because I think this case is more egregious than Doody. There's an age differential, 17 and a half, just turned 15. Doody was a B student. Johnson was a ninth-grade dropout. Doody was an emancipated minor with a job, a National Guard Honor Guard with his own apartment. Mr. Johnson wasn't even old enough to get a learner's permit, never mind own an automobile. Doody was asked if he wanted his mother. Johnson was never offered those opportunities, no food, no water, no bathroom break, three requests over half an hour. No lies or deceit were used on Doody. The office was comfortable. They treated him as a fellow uniformed officer, essentially. Thank you, Your Honor. Thank you, Ms. O'Connor. Mr. Katz, thank you as well. The case is submitted. Good morning.
judges: Fernandez, Silverman, Graber